COURT OF APPEALS
DECISION
DATED AND FILED

December 11, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1957-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CF196

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

ANTHONY JOHN HESSLING,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Washington County: JAMES K. MUEHLBAUER, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Anthony John Hessling appeals from the judgment of conviction entered on his guilty plea to possession of narcotic drugs.  He contends the circuit court erred in denying his suppression motion, which motion was based on Hessling's assertion he was unlawfully seized at the time the arresting officer discovered illegal drugs in his vehicle.  For the following reasons, we affirm.

## Background

¶2    The following relevant testimony was presented at the evidentiary hearing on Hessling's suppression motion.

¶3    A Village of Slinger police officer testified that around 8:53 p.m. on June 2, 2021, a caller contacted the police with concern about a dangerous driver.  At 8:56 p.m., the officer was dispatched to respond to the complaint, by that time made by two citizen callers, that a vehicle on Interstate 41 (I-41) was "swerving all over the roadway and travelling with its hazards on for the last ten miles."  The callers provided a description of the vehicle, its location, and its direction of travel.  One of the callers further reported continuing to follow the vehicle.  The callers provided police with their names and phone numbers.

¶4    Minutes later, the officer located the vehicle, which still had its hazards on, and began following it.  The officer observed the vehicle swerving and "almost str[iking] the metal guardrail on the shoulder side" of I-41.  "Based on the erratic driving," the officer was "concerned that the driver may be impaired," so he performed a traffic stop at 9:02 p.m.

¶5    Engaging with Hessling, who was the driver and sole occupant of the vehicle, the officer noted he had "constricted pupils," "was sweating

profusely," and exhibited confusion when the officer sought basic information—for example, "if I asked for an address, he started giving me a different phone number again." The officer testified that "[c]onstricted pupils are usually correlated with narcotic use," and profuse sweating "also may be" an indicator of such use. The officer was concerned Hessling was impaired based on "the driving and those indicators of our face-to-face contact," so he had Hessling perform field sobriety tests (FSTs). At the completion of the tests, the officer concluded there was not probable cause to arrest Hessling for impaired driving but that "[i]t was extremely close," adding "it was close enough where it was a safety hazard if he continued to drive." The officer called for a K-9 officer to respond to the scene due to "reasonable suspicion to believe that there was potential drug activity within the vehicle."

¶6 The officer told Hessling, "I don't necessarily want to arrest you for OWI [operating while intoxicated] tonight, okay, but I really don't feel comfortable with you driving." The officer added, "It was just a safety concern." The officer asked Hessling if Hessling "could make arrangements to find a ride or call someone to help him out," and Hessling "agreed to do so, and he immediately began looking for someone to help him." Hessling's father eventually paid for a hotel room for Hessling to stay in for the night, and after the conclusion of the traffic stop, the officer drove Hessling to that hotel.

¶7 The K-9 officer arrived on the scene, and the K-9 had "a positive alert" on Hessling's vehicle. The vehicle was searched, and a suspicious substance was found that the state crime lab later identified as fentanyl. The officer testified that he did not arrest Hessling the night of the stop because a field test of the substance came back with inconclusive results.

¶8 On cross-examination, the officer explained that he had drug recognition training "within the academy" and the department's drug recognition expert provides "kind of a refresher training," but the officer himself had no specialized drug recognition training. He acknowledged he detected no odors when he approached Hessling's vehicle and did not see any drugs or drug paraphernalia through the windows. When asked if Hessling exhibited any indicia of impairment as he exited the car, the officer stated, "Not that I remember immediately after, no." The officer located no drugs or drug paraphernalia on Hessling during a pat-down search for safety.

¶9 The officer testified that he did not recall how Hessling performed on the horizontal gaze nystagmus or one-leg-stand tests. Related to the walk-and-turn test, the officer stated he did not recall any clues of impairment he specifically observed, but stated Hessling "must have" exhibited some "[b]ecause after the totality of the standardized field sobriety tests, I remember making the judgment whether [or not] to arrest for the OWI, because there [were] enough clues present where it was borderline. It was very close." The officer acknowledged that in his report of the traffic stop, he simply indicated he had determined Hessling was not impaired and did not indicate that it was "close" or that there were "some clues." The officer stated that if he had determined Hessling to have been impaired, his report of the traffic stop "would have [had] more descriptive detail," adding that because he determined Hessling was not impaired, he did not record the details in his report of how Hessling did on each FST. The officer testified that Hessling had told him that his swerving was because "he was tired and looking for his phone."

¶10 The officer testified again that at the conclusion of the FSTs, he determined that Hessling was not impaired, but he told Hessling that based on the

4

results of those tests, the officer "didn't feel comfortable with him driving. I believed that he was going to be a safety concern on the road if he continued to drive." The officer indicated that despite concluding Hessling was not impaired, "[i]mmediately" after the FSTs, he called for a K-9 unit to respond to the scene.

¶11 In addressing a question from the circuit court related to whether or not Hessling was "free to go" after the FSTs, the officer stated, "I was more concerned about him not getting back in his vehicle and driving again. So … for that reason I wanted to wait with him, make sure he didn't get back in his vehicle, and he would actually find a safe ride or a way to get where he needs to go."

¶12 On redirect examination, the officer indicated he would have allowed Hessling to leave the scene, but not by driving his vehicle. When asked if it was an accurate representation of his report that the report indicated the officer "would not feel comfortable with [Hessling] driving," the officer responded, "Yes."

¶13 The officer continued his testimony with recross-examination:

> [Counsel:] You were concerned that he was going to get back in the vehicle, and you didn't want him to do that?
>
> [Officer:] Yes.
>
> [Counsel:] Why? You just said he was not impaired. Why did you not want him to get into the vehicle and drive?
>
> [Officer:] Because of how close or how poor everything was, the whole situation. His constricted pupils, his body language. How he did on the field sobriety tests; whether he was determined not to be impaired, it was still a safety concern for him to get back behind the vehicle.

> I don't know if he had adjusted anything or if he was going up in his high or whatever it may be, I didn't want to take a risk of him getting back in the vehicle.

¶14 Hessling also testified. He stated his swerving on the roadway was because he was "a little tired" and had dropped his phone and was reaching down, trying to retrieve it, for "[f]ive minutes, three minutes. A very short time. A minute." He stated he did not recall having his hazards on, but intimated his knee "could [have] bump[ed] it." Hessling testified that when he spoke with his father during a phone call at the scene, he told his father that "the officer would not allow me to drive."

¶15 The circuit court found the officer's testimony credible. It stated that even though the officer did not arrest Hessling for driving under the influence, "that doesn't mean he didn't observe some clues" but just "didn't write down those details because he didn't actually arrest Mr. Hessling for operating under the influence of drugs." In responding to the State's "not overly persuasive" argument that prior to the K-9 alert "there was reasonable suspicion to believe that drugs were in the vehicle," the court stated, "[T]here is more reasonable suspicion to believe that Mr. Hessling had drugs. Again, sweating profusely, all over the road, constricted pupils consistent with drug use."

¶16 Addressing whether Hessling was unlawfully seized at the time, the circuit court noted that the officer did not arrest him but was "trying to persuade him that it's not safe for him to be driving," based on the observed bad driving "by three people, mind you," as well as "the observed behavior of Mr. Hessling." The court reiterated,

> constricted pupils, profuse sweating, and confusion, which again, is an indication something ain't right and somebody probably shouldn't be driving.

6

> So it doesn't surprise me, and it's common sense, and it's a safety concern that [the officer] had that it would be better for Mr. Hessling not to drive his vehicle.

¶17     The circuit court ultimately denied Hessling's suppression motion based upon its determination that Hessling was not actually seized following the FSTs, but it additionally noted that the officer's decision to not arrest Hessling following the FSTs enhanced the officer's credibility. The court stated that

> a fair number of officers would have gone the other way and just plain out arrested him. The officer didn't, and he gave Mr. Hessling the benefit of any doubt there, or gave him a break, whatever you want to call it, but he did that.
>
> I mean, that adds to his credibility. As a matter of fact, I'm kind of scratching my head wondering, you know, why he made that decision.

The court further determined that the

> dog sniff was perfectly acceptable because the vehicle was legally parked on the side of the road, and both the officer and Mr. Hessling decided he should not drive and the vehicle was left there.… [A]nd if it's parked there, you know, it's like going out in the parking lot now, you can sniff everybody's vehicle.

¶18     Hessling appeals.

### *Discussion*

¶19     "When we review a circuit court's ruling on a motion to suppress evidence, we apply the clearly erroneous standard to the circuit court's findings of fact. However, we review the circuit court's application of constitutional principles to the findings of fact de novo." *State v. Smiter*, 2011 WI App 15, ¶9, 331 Wis. 2d 431, 793 N.W.2d 920 (citation omitted).

7

¶20 Hessling insists "the traffic stop should have concluded once Mr. Hessling completed field sobriety testing" and he should have been permitted to get back into his vehicle and go on his way at that time. Because he was not permitted to do so—and was instead told by the officer to make other arrangements for proceeding on his way—he asserts he was unlawfully seized.

¶21 We conclude that we need not determine whether Hessling was actually seized following the FSTs because even if he was, such seizure was lawful. This is so because the officer had probable cause to believe Hessling had been operating his vehicle while impaired, in violation of WIS. STAT. § 346.63(1)(a) (2021-22).[1] While the officer believed he did not have probable cause, he in fact did, and he could have arrested Hessling and even taken him to a local hospital for a blood draw to determine what substance(s) and how much of it was impairing his driving.

¶22 Probable cause "must be assessed on a case-by-case basis," *State v. Lange*, 2009 WI 49, ¶20, 317 Wis. 2d 383, 766 N.W.2d 551, and considers "the totality of the circumstances within the arresting officer's knowledge" at the time of the seizure," *State v. Nordness*, 128 Wis. 2d 15, 35, 381 N.W.2d 300 (1986). To constitute probable cause, the evidence of which law enforcement is aware

> must amount to "more than a possibility or suspicion that the defendant committed an offense," the evidence required to establish probable cause "need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." It is sufficient that the evidence known to [law enforcement] would lead a reasonable police officer to believe that the defendant probably was under the influence of an intoxicant while operating his vehicle.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

*Lange*, 317 Wis. 2d 383, ¶38 (citation omitted). The question of probable cause turns on an objective standard—"what a reasonable officer in the position of this officer would have determined, not what this particular officer subjectively determined." *State v. Rose*, 2018 WI App 5, ¶25, 379 Wis. 2d 664, 907 N.W.2d 463. Whether an officer had probable cause for a seizure of a person is a question of law we review de novo. *Washburn County v. Smith*, 2008 WI 23, ¶16, 308 Wis. 2d 65, 746 N.W.2d 243.

¶23 In the case now before us, this officer was either cutting Hessling a break by not arresting him for OWI (telling Hessling, "I don't necessarily *want* to arrest you for OWI tonight" (emphasis added)), as the circuit court recognized might have been the case, or the officer simply did not recognize that probable cause existed to arrest Hessling for a violation of WIS. STAT. § 346.63(1)(a), as the court also seemed to recognize. The officer here almost seemed to hold to a personal, beyond-a-reasonable-doubt standard; as if he needed to be certain Hessling was legally impaired in order to arrest him. As indicated above, probable cause is a lower standard.

¶24 WISCONSIN STAT. § 346.63(1)(a) "makes it unlawful for a person to operate a vehicle while under the influence of an 'intoxicant' or a 'controlled substance,' or while under the influence of 'any other drug to a degree which renders him or her incapable of safely driving.'" *Rose*, 379 Wis. 2d 664, ¶16. The evidence of which the officer here was aware "would lead a reasonable police officer to believe that [Hessling] probably was under the influence of" a drug or drugs "to a degree which render[ed] him … incapable of safely driving." *See Lange*, 317 Wis. 2d 383, ¶38; § 346.63(1)(a). The evidence "amount[ed] to 'more than a possibility or suspicion'" that Hessling had been operating his vehicle in this condition. *Lange*, 317 Wis. 2d 383, ¶38 (citation omitted).

9

¶25    The officer was aware that two citizens, who had provided their names and phone numbers, and one of whom was continuing to follow Hessling's vehicle, had called to report that Hessling was "swerving all over the roadway and travelling with [his] hazards on for the last ten miles." After locating Hessling, who still had his hazards on, minutes later, the officer followed him and observed Hessling swerving and "almost str[iking] the metal guardrail on the shoulder side" of I-41. Hessling conceded at the hearing that the officer had reasonable suspicion to pull him over, and he takes no contrary position on appeal.

¶26    While engaging with Hessling during the traffic stop, the officer observed that his pupils were constricted, he was sweating profusely, and when the officer tried to obtain basic information, Hessling had difficulties with that, including providing the officer with a phone number when the officer asked him for his address. The officer testified to his knowledge that "constricted pupils are usually correlated with narcotic use" and agreed that profuse sweating "also may be" an indicator of such use. Concerned Hessling was impaired, the officer had him perform FSTs. While the officer did not record the details of Hessling's performance on these tests in his report, the circuit court found, consistent with the officer's testimony, that this was "because he didn't actually arrest Mr. Hessling for operating under the influence of drugs." The officer did testify, however, that after conducting those tests, he believed "[i]t was extremely close" as to whether Hessling was impaired or not. The officer concluded that he "didn't find probable cause for arrest for impairment, but it was close enough where it was a safety hazard if he continued to drive." However Hessling actually performed on the FSTs, it was not so impressive as to allay the officer's concerns that Hessling could not safely drive. Indeed, the officer's testimony shows that following those tests, the officer felt strongly that Hessling could not safely drive and that it was

due to drugs in his system. The officer repeatedly testified that he was not going to permit Hessling to get back into his car and drive because Hessling could not safely do so—a very obvious and common sense position in light of the dangerous driving the two citizens reported and the officer himself observed, and the physical observations the officer made of Hessling's condition.

¶27 Testifying that he did not believe probable cause existed to arrest Hessling, it appears the officer misunderstood the standard of probable cause. There can be no mistaking that the officer was convinced Hessling's faculties were being affected by a drug or drugs of some kind. Based on Hessling's physical condition, which the officer observed on the scene and described in court, neither the officer at the time of the stop nor the circuit court at the hearing believed that Hessling's dangerous driving was caused by one to five minutes of trying to retrieve a cell phone, as Hessling testified.[2] The facts of which the officer was aware would have led a reasonable officer to believe there was probable cause to arrest Hessling. For a reasonable officer, the evidence of which this officer was aware following FSTs constituted more than a possibility that Hessling had a drug or drugs in his system that "render[ed] him … incapable of safely driving." *See Rose*, 379 Wis. 2d 664, ¶16 (quoting WIS. STAT. § 346.63(1)(a)). A reasonable officer would have believed Hessling "probably was under the influence of [a drug]" and that it was "to a degree which render[ed] him … incapable of safely driving." *See Lange*, 317 Wis. 2d 383, ¶38; § 346.63(1)(a). This was all that was needed for probable cause to lawfully seize Hessling.

---

[2] Indeed, it was nine minutes alone from when the first concerned citizen called the police to when the officer performed the traffic stop.

¶28    Because the officer had probable cause to arrest Hessling for a drug-based OWI violation, Hessling continued to be lawfully seized during the course of the stop, contrary to his contention on appeal.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2021-22).